UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

CHARLES WALLERT,

                    Plaintiff,

         -v-

GUILLAUME JEAN ATLAN, SIDNEY DOV
PROSPER BENICHOU p/k/a MANI HOFFMAN,
LAFESSE RECORDS, UNIVERSAL MUSIC
PUBLISHING, INC., UNIVERSAL MUSIC
PUBLISHING, UNIVERSAL MUSIC-MGB
SONGS, UMG RECORDINGS, INC.,
UNIVERSAL INTERNATIONAL MUSIC B.V.,
CYCLO RECORDS, CYCLO MUSIC,
SERHAT BEDÜK p/k/a BEDÜK, AUDIOLOGY
RECORDS, SEYHAN MÜZIK, DOES 1–50, and
XYZ CORPORATIONS 1–50,

                    Defendants.

------------------------------------------------------------X

14 Civ. 4099 (PAE)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/26/15

PAUL A. ENGELMAYER, District Judge:

    This case involves claims of copyright infringement of a musical work and breach of a

contract providing for licensing royalties relating to that work.  Plaintiff Charles Wallert alleges

that in 1978, he composed and produced a musical composition and recording, "The Rock," that

later was infringed upon by a series of malefactors.  The infringements began, Wallert alleges, in

2000, when three defendants[1] wrote and recorded the song "Starlight."  "Starlight" later was

licensed in France, the United States, and elsewhere by entities, including three other

---

[1] These are Guillaume Jean Atlan; Sidney Dov Prosper Benichou, professionally known as Mani Hoffman ("Hoffman"); and Lafesse Records (collectively, the "Starlight defendants").

defendants.[2]  Next, Wallert alleges, in 2008, defendant Serhat Bedük composed and produced a composition and recording, "Hot Bitch," which also infringed "The Rock," and was published and distributed by defendant Audiology Records ("Audiology").  Finally, Wallert claims, defendant Universal International Music B.V. ("UIM BV"), which holds the distribution rights of "The Rock," has failed to pay him royalties for its licensing of "The Rock," including for the sampling of that recording on infringing records, such as "Starlight."

Based on this narrative, Wallert brings claims of copyright infringement, under the United States Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*, and separately on the laws of 11 other nations[3]; breach of contract; breach of the covenant of good faith and fair dealing; wrongful interference with prospective contractual relations; and unjust enrichment.  Defendants are (1) the Starlight defendants; (2) the Universal publishing defendants, UMG Recordings, Inc. ("UMG"), and UIM BV (collectively, the "Universal defendants"); (3) Cyclo Records and Cyclo Music; (4) Bedük, Audiology, and Seyhan Müzik (collectively, the "Hot Bitch defendants"); (5) Does 1–50; and (6) XYZ Corporations 1–50.  Wallert seeks injunctive relief, and statutory and punitive damages of at least $5 million.

Two motions are pending:  First, Hoffman moves to dismiss for lack of personal jurisdiction, under Federal Rule of Civil Procedure 12(b)(2).  Second, the Universal defendants move to dismiss Wallert's Fourth Amended Complaint ("FAC"), under Rule 12(b)(6).  Wallert opposes both motions, and moves for leave to take jurisdictional discovery.

---

[2] These are Universal Music Publishing, Inc. ("UMP US"), Universal Music Publishing ("UMP France"), and Universal Music-MGB Songs ("MGB Songs") (collectively, the "Universal publishing defendants").

[3] Wallert states that his allegations of infringement abroad arise under the laws of Australia, Belgium, France, Germany, Ireland, Italy, the Netherlands, New Zealand, Norway, Switzerland, and the United Kingdom.

For the following reasons, the Court grants Hoffman's and the Universal defendants' motions to dismiss, and denies Wallert's motion for leave to take jurisdictional discovery.

## I.     Background

### A.     Factual Background[4]

As noted, Wallert brings copyright infringement claims, in addition to an array of claims under state law.

The Court first recounts the composition, production, and distribution history of "The Rock," and the factual allegations relating to the three instances in which Wallert alleges copyright infringement.  These allegations also underlie Wallert's claims of wrongful interference with prospective contractual relations and unjust enrichment.

The Court then reviews the allegations relating to the licensing of the recording of "The Rock," which underlie his claims of breach of contract under California and New York law, tortious breach of the covenant of good faith and fair dealing under California law, and wrongful interference with prospective contractual relations.

#### 1.     The composition, production, and distribution of "The Rock"

Wallert, a music producer and composer, has produced and/or composed songs for recording artists including George Benson, Cuba Gooding, and Dionne Warwick. FAC ¶ 21.  In 1978, Wallert, with Michael Foreman and Al Gee, wrote the music and lyrics to a composition called "The Rock" ("The Rock composition"). *Id.* ¶ 22.  The Rock composition was co-published by Moonstruck Sounds, Ltd. ("Moonstruck"), of which Wallert is the sole owner and

---

[4] Except as otherwise noted, the Court's account of the facts of this case is drawn from the FAC and the exhibits attached thereto.  Dkt. 116.  In resolving the motions to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of the plaintiff.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

successor in interest to all rights, and Mich-Den Music, which is Foreman's publishing company. *Id.* ¶¶ 21–22. Moonstruck and Mich-Den Music also registered The Rock composition in the Copyright Office, at registration number PA37208. *Id.* ¶ 25. In 1978, The Rock composition also was registered with Broadcast Music Inc. ("BMI") for licensing. *Id.* ¶ 27.

Also in 1978, Wallert produced and financed a master sound recording of "The Rock" ("The Rock recording"), which was performed by a group of singers and musicians known as "East Coast." *Id.* ¶ 23. The Rock recording was later released that year by Family Music Productions, Inc., which conducted business as Family Records ("Family Records"). *Id.* Family Records, which ceased to do business in 1980, was a New York corporation solely owned by Wallert; he is the sole successor in interest to all rights held by Family Records. *Id.*

The Rock recording was a "very popular R&B disco dance hit of the late 1970s" that received nationwide radio and dance club play and appeared for months on national industry and radio musical play charts. *Id.* ¶ 43. Family Records later executed an agreement with RSO Records Inc. ("RSO"), selling the rights of The Rock recording in exchange for royalties, as discussed below. *Id.* ¶ 23.

### 2.      The three instances of alleged copyright infringement

*"Starlight"*:  Before creating "Starlight" (the "Starlight composition"), Atlan contacted an unidentified individual in the United States (defendant "Doe 1") regarding The Rock composition and recording. *Id.* ¶ 42. Doe 1 gave Atlan purported authorization to use all or some of The Rock composition and recording to create the Starlight composition and the recording of that composition (the "Starlight recording"). *Id.* Doe 1, however, lacked authority to authorize use of The Rock composition or recording. *Id.*

In 2000, the Starlight defendants created the Starlight composition, which, Wallert claims, infringed The Rock composition. *Id.* ¶ 41. In January 2001, Lafesse, with other entities including Cyclo Records, recorded, manufactured, and distributed the Starlight recording, which was recorded by a group known as "The Superman Lovers featuring Mani Hoffman." *Id.* Atlan and Hoffman performed on the Starlight recording, and Atlan, who has stated that "R&B/Funk records are his number one influence," produced the composition. *Id.* ¶¶ 41, 43. The Starlight recording, a French House recording,[5] allegedly infringed The Rock composition and recording. *Id.* ¶¶ 41, 43.

Since January 2001, the Starlight defendants have sold and/or distributed copies of the Starlight recording in various media (*e.g.*, CDs, cassettes, DVDs, videocassettes, videos, digital downloads, and ringtones) directly and through licensed agents, and have licensed and continue to license the Starlight recording for further recording and public performance through performing rights organizations, such as BMI, the American Society of Composers, Authors and Publishers ("ASCAP"), and the Harry Fox Agency, Inc. ("HFA"). *Id.* ¶ 47.

Since January 2001, UMP France, and its predecessors in interest, have acted as publishers for the Starlight composition. *Id.* ¶ 51. UMP France also has authorized and licensed the production, distribution, and sale of the Starlight recording, as well as the public performance of the Starlight composition, in France and elsewhere, and has received royalties and other revenue from such licensing. *Id.* ¶¶ 51–52. In the United States, Universal MGB was Universal France's licensed and authorized agent and administrator. *Id.* ¶¶ 51–52.

---

[5] French House music is influenced by R&B/funk records of the late 1970s and early 1980s. FAC ¶ 43.

Also since January 2001, UMG has sold and/or distributed record compilations that included the Starlight recording. *Id* ¶ 74.

*Mango recording*: In 2011, Giuseppe Mango, professionally known as Mango, a non-party, recorded the Starlight composition on an album entitled, "La terra degli aquiloni" (the "Mango recording"). *Id.* ¶ 53. The Universal publishing defendants licensed the Starlight composition for the Mango recording, received royalties and other revenue from the Mango recording, and paid a share of those proceeds to the Starlight defendants. *Id.* ¶ 54. A karaoke version of the Mango recording also has been released, which has been a source of royalties and other revenue for the Starlight defendants and the Universal publishing defendants. *Id.*

*"Hot Bitch"*: In 2008, Bedük and possibly others created a musical composition entitled "Hot Bitch" (the "Hot Bitch composition"), which allegedly infringed The Rock composition. *Id.* ¶ 129. In 2008, Audiology, with Columbia Records ("Columbia"), a non-party in this case, recorded, manufactured, and distributed a sound recording by Bedük (the "Hot Bitch recording"), which allegedly infringed The Rock recording. *Id.* The Hot Bitch recording is included in an album entitled "Dance Revolution," released by Audiology and/or Columbia. *Id.*

### 3.   Licensing of The Rock recording

On June 29, 1979, Family Records executed an agreement with RSO, selling the rights of The Rock recording in exchange for royalties (the "RSO agreement"). *Id.*, Ex. B ("RSO Agreement"), at 38.   Under the RSO agreement:

> [Family Records] hereby sell[s] to RSO and [RSO] hereby purchase[s] from [Family Records] the [master recordings of The Rock] [hereinafter "Acquired Masters"], free and clear of any liens, encumbrances or claims. . . .

> [Family Records] hereby grant[s] to [RSO] the sole, exclusive and worldwide rights in, title to, and ownership of, the Acquired Masters and of the performances embodied therein, including, but not limited to, the worldwide copyrights therein and thereto, together with all renewals and extensions thereof,

all of which shall be entirely [RSO's] property free of any claims whatsoever by [Family Records] or by any other party. Without limitation of the foregoing, [RSO] and/or [RSO's] designees shall have the exclusive worldwide right in perpetuity to manufacture, sell, distribute and advertise records or other reproductions (visual or nonvisual) embodying the Acquired Masters, to lease, license, convey or otherwise use or dispose of the Acquired Masters by any method now or hereafter known, in any field of use, to release records under any trademarks, trade names or labels, to perform the records or other reproductions publicly and to permit the public performance thereof by radio broadcast, television or any other method now or hereafter known, all upon such terms and conditions as [RSO] may approve, and to permit others to do any or all of the foregoing, or [RSO] may at our election refrain from any or all of the foregoing.

RSO agreement ¶¶ 2–3.

Under the RSO agreement, Family Records, in return for the rights of The Rock recording, was to "be paid in respect of the sale by [RSO] or [RSO's] licensees of phonograph records embodying the Masters [recordings] recorded hereunder and in respect of any other exploitation by [RSO] or [RSO's] licensees of such Masters [recordings]" royalties, as set forth in the RSO agreement. *Id.* ¶ 10. The agreement also provides that "[n]either party hereto shall be deemed to be in material breach of any of its obligations hereunder unless and until the non-breaching party shall have given the other party hereto specific written notice by certified or registered mail, return receipt requested, of the nature of such breach and said other party shall have failed to cure such breach within thirty (30) days after its receipt of such written notice." *Id.* ¶ 22(c). The RSO agreement also provides that it "shall not become effective until signed by a duly authorized officer of [Family Records]." *Id.* ¶ 22(i). Finally, it provides that Family Records is "solely responsible for and shall pay any and all royalties or other sums which may be payable to any producer (including, without limitation [Wallert]) of any of the Masters [recordings] in respect of the recording and production thereof, the manufacture and sale of phonograph records embodying such Masters [recordings], and any other exploitation of such Masters [recordings]." *Id.* ¶ 25. Wallert, on behalf of Family Records, signed the agreement.

*Id.* at 38.  He alleges that he has not received any royalties pursuant to the RSO agreement.  FAC ¶¶ 89–90.

On September 19, 1979, RSO filed for and obtained a registration of The Rock recording as a published sound recording, with registration number SR12223.  *Id.* ¶ 29.  In 1982, RSO ceased to exist, and was purchased by Polydor Ltd. and Polygram, Inc.  *Id.* ¶ 28.  In 1987, Polygram International Music B.V.  ("Polygram") became the successor in interest to the RSO agreement rights.  *Id.*  Polygram thereafter became UIM BV, the current interest-holder of the RSO agreement rights.  *Id.*

In alleging breach of contract by UIM BV, Wallert relies on a copy of a July 1, 2006 global licensing agreement between UMG and Sony BMG Music Entertainment ("Sony BMG") (the "UMG-Sony BMG agreement").  *Id.*, Ex. F.  The UMG-Sony BMG agreement was executed to "establish a reciprocal licensing process to facilitate and expedite the prompt and efficient licensing of sound recording samples from and to one another and/or to their respective recording artists."  *Id.* at 1.  The UMG-Sony BMG agreement outlined the short-form license that would be executed when a recording artist under either the UMG or Sony BMG record labels sampled the musical recording of another recording artist from the other record label.  *Id.*; *see also id.*, Ex. A ("Short Form Sample License").   The agreement required that a short-form license identify, *inter alia*, the sampled recording, the new recording, and the royalty rate.  *See* Short Form Sample License.

Wallert claims that Sony sampled The Rock recording on three occasions:  first, on the Starlight recording; second, on the Mango recording; and third, on the Mango karaoke recording. *Id.* ¶ 95.  He alleges that UIM BV did not collect royalties for any of the sample licensing of The Rock recording by Sony, and did not pay Wallert corresponding royalties.  *Id.* ¶¶ 96–97.

### B.    Procedural History

On June 6, 2014, Wallert filed an initial complaint, bringing claims of copyright infringement under U.S. law, and unjust enrichment against defendants Atlan, Hoffman, Independiente Ltd., Cyclo Records, Disques Vogue, Song Music Entertainment, Inc. ("Sony Music"), BMG France, Universal Music Publishing MGB France, MGB France, Universal Music Group, Inc., the Hot Bitch defendants, Columbia, Does 1–50, and XYZ Corporations 1–50. Dkt. 2. Wallert then moved for and was granted leave to file, on July 17, 2014, a first amended complaint, Dkt. 5, and a second amended complaint, Dkt. 28, on October 20, 2014, in which he added Lafesse as a defendant. On October 21, 2014, Wallert dismissed without prejudice Disques Vogue, Sony Music, and BMG France. Dkt. 28. On January 8, 2015, Wallert dismissed without prejudice Independiente. Dkt. 63.

On March 19, 2015, Wallert filed a third amended complaint, which added state law claims, including breach of contract. Dkt. 77. On May 11, 2015, the Universal defendants filed a motion to dismiss—the first such motion filed in this case. Dkt. 99. The Court, as per its usual practice, granted Wallert "a final opportunity to amend." Dkt. 112, at 2; *see also* Dkt. 107.

On June 1, 2015, Wallert filed the FAC, Dkt. 116, bringing 11 claims, including of:

(1) Copyright infringement under federal law against the Starlight defendants and the Universal publishing defendants;
(2) Copyright infringement under foreign law against the Starlight defendants and the Universal publishing defendants;
(3) Copyright infringement under federal law against UMG;
(4) Copyright infringement under foreign law against UMG;
(5) Breach of contract under California law against UIM BV;
(6) Tortious breach of the covenant of good faith and fair dealing under California law against UIM BV;
(7) Further tortious breach of the covenant of good faith and fair dealing under California law against UIM BV;
(8) Wrongful interference with prospective contractual relations against the Starlight defendants and UIM BV;
(9) Breach of contract under New York law against UMG;

(10) Copyright infringement against the Hot Bitch defendants; and

(11) Unjust enrichment against the Starlight defendants and Bedük.

FAC ¶¶ 39–145.

Wallert seeks a permanent injunction barring defendants from, *inter alia*, infringing on

Wallert's rights and licensing the Starlight recording and/or the Hot Bitch recording, and

directing defendants to deliver for impoundment all copies of the Starlight recording and the Hot

Bitch recording. *Id.* at 51–53. Wallert also seeks statutory damages under the Copyright Act, all

profits received by defendants from the sale of the Starlight and Hot Bitch recordings, all

damages suffered by Wallert from defendants' copyright infringements, and punitive damages of

not less than $5 million. *Id.* at 54.

On June 10, 2015, Hoffman filed a motion to dismiss for lack of personal jurisdiction,

under Federal Rule of Civil Procedure 12(b)(2), Dkt. 124, and a supporting memorandum of law,

Dkt. 126 ("Hoffman Br."). On July 22, 2015, the Universal defendants filed a motion to dismiss,

under Federal Rule of Civil Procedure 12(b)(6), or in the alternative, for summary judgment,

Dkt. 143, and a supporting memorandum of law, Dkt. 144 ("Universal Br."). On August 12,

2015, Wallert filed opposing briefs to Hoffman's motion, Dkt. 155 ("Wallert H Br."), and to the

Universal defendants' motion, Dkt. 156 ("Wallert U Br."). On August 24, 2015, Hoffman and

the Universal defendants filed their respective reply briefs, Dkt. 158 ("Universal Reply Br.") and

161 ("Hoffman Reply Br.").

On September 29, 2015, argument was held. ("Tr."). At argument, the parties stated on

the record that all claims against defendant Universal Music-MGB NA LLC had been settled,

and are to be dismissed with prejudice. Dkt. 164; *see also* Tr. 5.

## II.   Applicable Legal Standards[6]

### A.   Rule 12(b)(2)—Personal Jurisdiction

"[T]he plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (citation omitted); *accord In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (per curiam) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). "Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations." *Id.* (quoting *Ball*, 902 F.2d at 197); *accord In re Terrorist Attacks*, 714 F.3d at 673 ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a *prima facie* showing that jurisdiction exists." (citation omitted)).

"This showing may be made through the plaintiff's 'own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant.'" *S. New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (quoting *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001)). The Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs, resolving all

---

[6] The Universal defendants originally moved to dismiss the FAC under Rule 12(b)(6) or, in the alternative, for summary judgment under Rules 12(d) and 56. However, the motion for summary judgment was directed only at the claims against Universal MGB. *See* Universal Reply Br. 2 n.2. Because Universal MGB has been dismissed from this case with prejudice, the Court treats the Universal defendants' as moving solely under Rule 12(b)(6).

doubts in their favor." *Dorchester*, 722 F.3d at 85 (quoting *S. New Eng. Tel.*, 624 F.3d at 138); *accord A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) ("[W]here the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." (citation omitted)). Nevertheless, the Court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks*, 714 F.3d at 673 (citations omitted); *accord Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).

**B.     Rule 12(b)(6)**

To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (citing *Twombly*, 550 U.S. at 556). Where a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570. The Court must accept as true all well-pleaded factual allegations in the complaint, and "draw[ ] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006) (internal quotation marks and citation omitted). On the other hand, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949; *see also Twombly*, 550 U.S. at 555 (noting

that a court is "not bound to accept as true a legal conclusion couched as a factual allegation") (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (internal quotation marks omitted)).

## III.   Discussion

Hoffman and the Universal defendants bring separate motions.  Hoffman argues that this Court lacks personal jurisdiction over him.  The Universal defendants argue that Wallert's claims against them do not state a claim, including because (1) Wallert lacks standing to bring the copyright infringement claims under U.S. law, (2) the Court should decline to exercise jurisdiction over the copyright infringement claims based on foreign law, and (3) the state-law claims regarding the licensing of The Rock recording are substantively deficient.

The Court first addresses Hoffman's challenge to personal jurisdiction; then the Universal defendants' challenges to the federal and foreign law-based copyright infringement claims; and then addresses the state-law claims related to the licensing of The Rock recording. Finally, the Court addresses Wallert's motion for leave to take jurisdictional discovery.

### A.   Personal Jurisdiction as to Hoffman

The FAC brings claims against Hoffman of federal and foreign copyright infringement, wrongful interference with prospective contractual claims, and unjust enrichment.  Hoffman, a French citizen who is a resident of Florida, argues that personal jurisdiction is lacking because the FAC does not adequately allege that this Court has specific or general jurisdiction over him. Hoffman Br. 4–10.

The Court applies a two-part test to evaluate personal jurisdiction.  First, the Court must determine whether, under New York law, there is personal jurisdiction over the defendant. *Grand River Enters. Six Nations Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005).  Second, if

13

there is personal jurisdiction, the Court must determine whether "an exercise of jurisdiction under these laws is consistent with federal due process requirements." *Id.*

Under the New York long-arm statute, a court in New York can exercise personal jurisdiction over a non-resident defendant based either on general jurisdiction, under New York Civil Practice Law and Rule § 301, or specific jurisdiction, under C.P.L.R. § 302. *See A.W.L.I. Grp., Inc. v. Amber Freight Shipping Lines*, 828 F. Supp. 557, 563 (E.D.N.Y. 2011). Here, the FAC asserts both of these as grounds for jurisdiction over Hoffman.

### 1.   C.P.L.R. § 301's "doing business" standard

C.P.L.R. § 301 provides for "personal jurisdiction over a non-domiciliary defendant whose business activities within New York are 'continuous and systematic.'" *Pieczenik v. Dyax Corp.*, No. 00 Civ. 243 (HB), 2000 WL 959753, at *2 (S.D.N.Y. July 11, 2000) (citing *Beacon Enter. Inc. v. Menzies*, 715 F.2d 757, 762 (2d Cir. 1983)), *aff'd*, 265 F.3d 1329 (Fed. Cir. 2001). To be amenable to general jurisdiction under § 301, Hoffman must be doing business in New York "not occasionally or casually, but with a fair measure of permanence and continuity." *Beacon*, 715 F.2d at 762 (citation omitted).

The FAC alleges that Hoffman is subject to general jurisdiction by virtue of "(a) contracting through licensing clearinghouses located in New York such as ASCAP and [the HFA], directly and/or through an agent publisher such as UMP France . . . to license rights in musical compositions and collect royalties therefor; and (b) contracting and collaborating with songwriters, recording artists and/or record producers in New York." FAC ¶ 9. These allegations, however, fall well short of alleging that Hoffman has "continuous and systematic" business activities in New York.

The allegation that Hoffman's contracts with clearinghouses such as ASCAP and the HFA, located in New York, is insufficient to show a sufficient depth of business activities to support general jurisdiction. Tellingly, Wallert cites no authority for that proposition. Rather, the cases in which personal jurisdiction has been found based on a defendant's licensing agreement with a clearinghouse have been based on a finding of *specific* jurisdiction, under C.P.L.R. § 302(a). *See, e.g.*, *Vasquez v. Torres Negron*, 434 F. Supp. 2d 199, 201 (S.D.N.Y. 2006); *Firma Meloydia v. ZYX Music GMBH*, No. 95 Civ. 6798 (DC), 1995 WL 28493, at *2–4, (S.D.N.Y. Jan. 25, 1995); *Linzer v. EMI Blackwood Music, Inc.*, 904 F. Supp. 207, 214–15 (S.D.N.Y. 1995); *Meyer v. Sharron*, No. 86 Civ. 9291 (TPG), 1986 WL 8311, at *1–2 (S.D.N.Y. July 24, 1986); *Greenky v. Irving Music*, No. 80 Civ. 2776 (GLG), 1981 WL 1370, *2–3 (S.D.N.Y. July 13, 1981); *see also Fort Knox Music, Inc. v. Baptiste*, 139 F. Supp. 2d 505, 509 (S.D.N.Y. 2001) (defendant's licensing agreement with BMI, a clearinghouse, did "not rise to the level of a systematic and continuous course of business in New York, particularly in circumstances where no credible allegation could be made that BMI was acting as defendant's agent," and thereby declining to exercise personal jurisdiction, pursuant to C.P.L.R. § 301).

In an alternative attempt to establish general jurisdiction, Wallert next asserts—based on a post-FAC declaration—that Hoffman is "actively" pursuing, in New York, a music career in the United States. To this end, his declaration attaches emails between himself and Hoffman on March 31–April 1, 2015 and recounts his conversations with Hoffman. *See* Wallert H Br. 3–4; *see also* Dkt. 152 ("Wallert Decl."), Ex. B (emails). These declarations are wholly inadequate to support a claim of personal jurisdiction. To begin with, they reflect an improper attempt by Wallert to manufacture such jurisdiction, by luring Hoffman into making statements about future business activity with Wallert involving New York. And even if that objection did not hold, the

snippets in these declarations on which Wallert seizes fall short of evidencing systematic and continuous business activities in New York sufficient to support general jurisdiction. At most, they can be taken to reflect instead that (1) Hoffman's wife is from New York, (2) Hoffman "temporarily" lived in New York to collaborate with songwriters, (3) Wallert and Hoffman had a business meeting in which they made plans to collaborate, (4) Wallert contacted a New York record label on Hoffman's behalf, and (5) Hoffman spoke with a New York attorney about a recording project on which Hoffman and Wallert were collaborating. Wallert H Br. 3–4.

These alleged contacts are further problematic in that they post-date the conduct on which Wallert's lawsuit is based, and indeed the initiation of the lawsuit itself. At argument, Wallert's counsel acknowledged that he is unaware of case law permitting a Court to consider such post-complaint communications between the parties as a basis to find general jurisdiction at the time of the complaint. Tr. 23. On the contrary, in general jurisdiction cases, the Second Circuit has stated, "district courts should examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances—*up to and including the date the suit was filed*—to assess whether they satisfy the 'continuous and systematic' standard. The determination of what period is reasonable in the context of each case should be left to the court's discretion." *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 569–70 (2d Cir. 1996) (emphasis added). The Court's judgment here is that Wallert's emails this spring, post-dating as they do the filing of this lawsuit, are not properly considered. But even if they were considered, the emails would not establish general jurisdiction over Hoffman. At most, they reflect that Hoffman had a handful of discussions of business-related matters (instigated by Wallert) with persons based in New York. These stray allegations fall short of demonstrating contacts so "systematic and continuous" that the Court should exercise general jurisdiction over

Hoffman. *See Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043

(2d Cir. 1990). Wallert therefore has failed to establish general jurisdiction over Hoffman.

      **2.**      **C.P.L.R. § 302(a) standards**

C.P.L.R. § 302(a), New York's long-arm statute, provides:

(a) Acts which are the basis of jurisdiction. As to a cause of action arising from
    any of the acts enumerated in this section, a court may exercise personal
    jurisdiction over any non-domiciliary, or his executor or administrator, who in
    person or through an agent:
    1.  transacts any business within the state or contracts anywhere to supply
        goods or services in the state; or
    2.  commits a tortious act within the state, except as to a cause of action for
        defamation or character arising from the act; or
    3.  commits a tortious act without the state causing injury to person or property
        within the state, except as to a cause of action for defamation of character
        arising from the act, if he (i) regularly does or solicits business, or engages
        in any other persistent course of conduct, or derives substantial revenue
        from goods used or consumed or services rendered, in the state, or (ii)
        expects or should reasonably expect the act to have consequences in the
        state and derives substantial revenue from interstate or international
        commerce; . . .

      The New York long-arm statute must be read in the light of the Fourteenth Amendment's

Due Process Clause, which permits a state to exercise personal jurisdiction over a non-resident

defendant only if that defendant has "certain minimum contacts [with the state] . . . such that the

maintenance of the suit does not offend traditional notions of fair play and substantial justice."

*Calder v. Jones*, 465 U.S. 783 (1984) (internal citations and quotation marks omitted). The

plaintiff also must show that the defendant had purposefully availed himself of the privilege of

doing business in the forum state, such that the defendant could foresee being haled into court in

that state. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). "Because

CPLR 302 does not reach as far as the constitution permits, if a defendant is amenable to long-

arm jurisdiction in New York, the constitutional standard is satisfied." *Vasquez*, 434 F. Supp. 2d

at 201 (citing *Firma Melodiya*, 1995 WL 28493, at *3).

Here, the FAC alleges that Hoffman transacted business in New York by having a licensing contract with the performing-rights organization ASCAP.[7]  Wallert argues that "[l]icensing musical compositions through New York-based organizations such as ASCAP constitute the sale of goods or services conferring jurisdiction over the foreign licensors." Wallert H Br. 5.  In so arguing, Wallert relies on *Linzer, supra*.  There, two defendants, residents of California and Tennessee, sought dismissal of copyright claims, claiming a lack of personal jurisdiction.  *See* 904 F. Supp. 207.  The plaintiffs alleged, however, that the defendants had licensed the songs at issue through the performing rights organization BMI, which conducted its activities, including providing royalties to the defendants, in New York.  *Id.* at 213.  "In so doing, [the defendants] [had] contracted to sell goods or services in New York."  *Id.*  The district court held that such licensing arrangements with clearinghouses like BMI constituted a sale of goods or services in New York, and supplied specific jurisdiction over the defendants under the New York long-arm statute.  *Id.* (collecting cases).  Similarly, in *Vasquez, supra*, the defendant's contract with ASCAP, under which ASCAP licensed for the defendants the allegedly infringing musical composition, was held sufficient to support specific jurisdiction over the defendant.  434 F. Supp. 2d at 202 (citing *Firma Melodiya*, 1995 WL 28493, at *2).

These cases, however, are inapposite, for a simple reason:  The FAC does not allege that the Starlight composition, the song at issue in Wallert's copyright infringement claims, was among those included in his alleged licensing contract with ASCAP (or another New York-based clearinghouse).  As *Linzer* pointedly noted:  "Personal jurisdiction under New York's long-arm statute further requires not only that the defendant transact business in the state but that

---

[7] To support this allegation, Wallert has supplied records from ASCAP, which list Hoffman as the sole composer or co-writer of eight songs, including the Starlight composition.

the cause of action arise from the in-state transactions." 904 F. Supp. at 212 (citing *Davis v. Costa-Garvas*, 595 F. Supp. 982 (S.D.N.Y. 1984)).[8]

In a separate argument not made until in his opposition to Hoffman's motion to dismiss, Wallert also argues that Hoffman is subject to personal jurisdiction under CPLR § 301(a)(2) and 301(a)(3). These bids also fail.

To be subject to personal jurisdiction under CPLR § 301(a)(2), a party generally must have committed a tort while in New York. *See Pincione v. D'Alfonso*, 506 F. App'x 22, 25 (2d Cir. 2012) ("CPLR § 302(a)(2) reaches only tortious acts performed by a defendant who was physically present in New York when he performed the wrongful act.") (quoting *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 28 (2d Cir. 1997) (internal quotation marks omitted)). A party also may be subject to personal jurisdiction under this provision through the acts of an agent: "New York courts have recognized that jurisdiction under § 302(a)(2) may extend to out-of-state individuals who did not themselves commit a tort while physical present in New York but who can be deemed responsible for such a tort based upon theories of agency or conspiracy." *LaChapelle v. Torres*, 1 F. Supp. 3d 163, 169 (S.D.N.Y. 2014) (citing *In re Satyam Computer Servs. Sec. Litig.*, 915 F. Supp. 2d 450, 484 (S.D.N.Y. 2013); *Emerald Asset Advisors v. Schaffer*, 895 F. Supp. 2d 418, 430 (E.D.N.Y. 2012)). "To be considered an agent for jurisdictional purposes, the alleged agent must have acted in the state for the benefit of, and with

---

[8] Hoffman further avers, in a sworn declaration, that he does not have a contract with ASCAP. Dkt. 160 ("Hoffman Reply Decl.") ¶ 13. Wallert does not contest this. The Court may "rely on affidavits submitted by the parties in deciding a Rule 12(b)(2) motion to dismiss." *Langenberg v. Sofair*, No. 03 Civ. 8339 (KMK), 2006 WL 2628348, at *5 (S.D.N.Y. Sept. 11, 2006); *see also Country Rock Café, Inc. v. Trucks Ins. Exch.*, 417 F. Supp. 2d 399, 401(S.D.N.Y. 2006) (citing *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)); *Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameries*, No. 03 Civ. 1681 (LAP), 2004 WL 2199547, at *5 (S.D.N.Y. Sept. 29, 2004). Even absent Hoffman's declaration, Wallert's pleadings would still fail to establish specific jurisdiction.

the knowledge and consent of' the non-resident principal," and the principal also must "some

control over the agent." *Cutco Industries, Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986)

(internal quotation marks and citations omitted).

Wallert argues that Hoffman is subject to jurisdiction under CPLR § 302(a)(2) because:

UMP France is the publisher of the infringing song. In the United States, Universal
MGB undertakes these activities as UMP France's exclusive U.S. subpublisher. A
subpublisher licensee administers rights granted to it by its licensor. Therefore, it
acts 'for the benefit of and with the knowledge and consent of' UMP France, who
in turn can only act 'for the benefit of and with the knowledge and consent' of its
writer licensor Hoffman. A licensee's further licensing and collection of royalties
are for the benefit of its exclusive licensor.

Wallert Br. 8. However, the FAC has not alleged that Hoffman exercised any control over UMP

France, or that UMP exercised "some control" over Universal MGB, as would be necessary to

establish that Hoffman is subject to personal jurisdiction. There is, therefore, no basis to find

Hoffman subject to personal jurisdiction pursuant to CPLR § 302(a)(2).[9]  *See Intersong-USA Inc.*

*v. CBS Inc.*, No. 84 Civ. 998 (JFK), 1990 WL 131191, at *6 (S.D.N.Y. Aug. 30, 1990) (where

"[t]here [was] no suggestion, nor could there be, that the foreign affiliates exert[ed] any type of

control over CBS Records, thus making CBS Records their agent in the U.S.[,]" declining to

"find that CBS conduct[ed] any activities in New York on behalf of the affiliates, and finds that

the relationship between CBS and its affiliates is that of licensor-licensee . . . and therefore [the

affiliates] are not subject to the jurisdiction of this [c]ourt").

---

[9] In his sworn declaration, Hoffman attests that he "never entered into any license agreement
with any of the Universal defendants, and never owned or controlled the record. . . . [and] had
absolutely no control over the publication or distribution of 'Starlight," and the Universal
defendants were not [his] agents anywhere in the world." Hoffman Reply Dec. ¶ 2.  Hoffman
also avers that he is "not employed by any of the Universal defendants, [is] not an officer of any
of those entities, and have no ownership interest in those entities." *Id.*

In arguing that Hoffman is subject to personal jurisdiction, pursuant to CPLR § 302(a)(3), Wallert relies on *Firma Melodiya*. *See* Wallert H Br. 10. There, however, Judge Chin held that defendants were subject to personal jurisdiction because the plaintiffs had demonstrated that the defendants "should have reasonably expected that their conduct would have consequences in the state *and* would receive revenue from interstate or international commerce." 1995 WL 28493, at *4 (emphasis added). Specifically, the plaintiffs had alleged that the defendants had received $225,000 for the license and ongoing royalties. *Id.* Here, by contrast, Wallert (and in his brief, not the FAC) has made only the conclusory allegation that Hoffman "derives substantial revenue from interstate or international commerce." Wallert H Br. 9–10. A party, however, "may not rely on 'conclusory non-fact-specific jurisdictional allegations' to overcome a [Rule 12(b)(2)] motion to dismiss." *Doe v. Del. State Police*, 939 F. Supp. 2d 313, 321 (S.D.N.Y. 2013) (quoting *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998)).

The Court accordingly declines to exercise specific jurisdiction over Hoffman, as Wallert has failed to make out a *prima facie* case of personal jurisdiction over Hoffman. The FAC's claims against Hoffman are, accordingly, dismissed.

### B. Copyright Infringement Claims

#### 1. Wallert's federal copyright infringement claims

The Universal defendants argue that Wallert's federal copyright infringement claims against the Universal publishing defendants and UMG[10] fail because Wallert has not alleged facts sufficient to show his ownership of The Rock composition, and therefore, he lacks standing to pursue such claims. Universal Br. 7. They are correct.

---

[10] Wallert also brings federal copyright infringement claims against the Starlight defendants, which includes Hoffman. Hoffman adopts the Universal defendants' challenges to these claims. Hoffman Br. 1 n.1.

Under the Copyright Act, "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b); *see also Russian Entm't Wholesale, Inc. v. Close-Up Intern., Inc.*, 482 F. App'x 602, 604 (2d Cir. 2012) (summary order); *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 32 (2d Cir. 1982) ("The Copyright Act authorizes only two types of claimants to sue for copyright infringement: (1) owners of copyrights, and (2) persons who have been granted exclusive licenses by owners of copyrights."), *superseded on other grounds by* Fed. R. Civ. P. 52(a).

To support his claim of standing, Wallert relies on a copy of a record of The Rock composition's copyright registration in the United States Copyright Office's copyright catalog. It states that Moonstruck and Mich-Den are the copyright claimants. FAC, Ex. A. Wallert argues that he has standing, based on this record, because: (1) he is sole owner of Moonstruck, FAC ¶ 21; (2) he is successor in interest to all of Moonstruck's rights, and the copyright ownership to The Rock composition was transferred to him, *id.*; and (3) he is beneficial owner of The Rock composition copyright (a claim he makes for the first time in his opposition to the Universal defendants' motion to dismiss), Wallert U Br. 3. Each of these arguments is defective.

First, the FAC's claim that Wallert, as owner of Moonstruck, is also the owner of Moonstruck's copyright ownership of The Rock composition, is legally wrong. "A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003). Therefore, "[a]n individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets." *Id.* at 475; *see also EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 476 (2d Cir. 2007) ("[S]hareholders do not hold legal title to any of the corporation's assets. Instead, the corporation—the entity itself—is vested

with the title." (quoting *United States v. Wallach*, 935 F.2d 445, 462 (2d Cir. 1991) (internal

quotation marks omitted))).

In opposing the motion to dismiss, Wallert seeks to revive this claim by claiming that he

"became the owner of the copyright by operation of law upon the dissolution of Moonstruck."

Wallert U Br. 2–3 (citing *Vapac Music Publ'g, Inc. v. Tuff 'N' Rumble Mgmt., Inc.*, No. 99 Civ.

10656 (GEL), 2002 WL 31519612, at *4 (S.D.N.Y. Nov. 8, 2002); *Gilbert v. Indiana*, No. 09

Civ. 6352 (DAB), 2011 WL 651427, at *9 (S.D.N.Y. Feb. 16, 2011)).  However, Wallert himself

repudiated this very claim in his declaration opposing that same motion.  There, he averred, he

"never formally dissolved Moonstruck."  Wallert Decl. ¶ 3.  And, notably, the FAC, the

operative pleading, does not allege that Moonstruck was dissolved.[11]  Based on the materials

cognizable on this motion, the Court cannot, and does not, find that Wallert is owner of The

Rock composition copyright as a result of his ownership of Moonstruck.

Second, as to the FAC's claim that Wallert is the successor in interest to Moonstruck and

thereby owns the copyright for The Rock composition, ownership of a copyright may either be

transferred by operation of law (*e.g.*, dissolution of the corporate entity) or by "an instrument of

conveyance, or a note or memorandum of the transfer . . . in writing and signed by the owner of

the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a); *see also Dallal*

*v. N.Y. Times Co.*, 352 F. App'x 508, 511 (2d Cir. 2009) (summary order) (citing *Davis v. Blige*,

505 F.3d 90, 100 n.10 (2d Cir. 2007)).  Wallert does not allege the existence of, let alone supply,

any such written documents.  *See* Universal Br. 8.  Rather, the FAC merely alleges that Wallert

---

[11] At argument, Wallert's counsel sought to distance himself from his client's declaration, stating
that (1) he did not know why Wallert had averred that he had never formally dissolved
Moonstruck, and (2) prior to the argument, he had "learned that Moonstruck was indeed
dissolved."  Tr. 29.  The Court declines to credit counsel's eleventh-hour, unsubstantiated factual
claim during argument.

is the successor in interest to all of Moonstruck's rights. FAC ¶¶ 21, 26. But in his opposition to the motion to dismiss, Wallert does not challenge the Universal defendants' argument, which the Court finds persuasive, that the FAC inadequately pled his claim to be a successor in interest.

Finally, Wallert, in his opposition to the motion to dismiss, claims, for the first time, that he is, if not the legal owner, the beneficial owner of The Rock composition copyright. Wallert U Br. 3. A beneficial owner is "the original author who transfer[s] [an exclusive copyright] to another, but . . . [is] entitled to receive royalties from that new owner for the exploitation of the author's work." *Poindexter v. Cash Money Records*, No. 13 Civ. 1155 (RWS), 2014 WL 818955, at *5 (S.D.N.Y. March 3, 2014); *see also Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir. 1984) ("When a composer assigns copyright title to a publisher in exchange for the payment of royalties, an equitable trust relationship is established between the two parties which gives the composer standing to sue for infringement of that copyright."); *Harris v. Simon & Schuster, Inc.*, 646 F. Supp. 2d 622, 632 (S.D.N.Y. 2009) ("author and sole copyright holder" who "granted S&S limited rights in the Work in exchange for the payment of royalties" is a "beneficial owner"); *id.* (collecting cases). The FAC, however, pleads only that Wallert "as the successor in interest to Moonstruck, is also a joint owner of the Copyright and thus has standing to bring this action with respect to the Defendants' unauthorized use of 'The Rock.'" FAC ¶ 26. The FAC does not allege, for example, that Wallert assigned the copyright title to Moonstruck in exchange for the payment of royalties, as would be necessary to establish his beneficial ownership of The Rock composition copyright.

Wallert therefore lacks standing to bring federal copyright infringement claims.  The

Court dismisses those claims against the Universal publishing defendants, UMG, and the

Starlight defendants.[12]

### 2.   Wallert's copyright infringement claims under foreign law

Wallert's copyright infringement claims based on foreign law are brought against the

Universal publishing defendants, UMG, and the Starlight defendants.  A threshold issue is what

the jurisdictional basis is for these claims.

Wallert appears to asks the Court to hear these claims solely as an exercise of

supplemental jurisdiction, based on his having brought the parallel copyright infringement claims

against the same defendants under United States law.  The Universal defendants argue that, upon

dismissal of Wallert's copyright infringement claims based on United States law, the Court

should decline to exercise supplemental jurisdiction over those based on foreign law.  Universal

Br. 19–20; *see also* Tr. 9.

The Court agrees that supplemental jurisdiction would not be properly exercised as to

Wallert's copyright-infringement claims based on foreign law.  Under 28 U.S.C. § 1367(c)(3),

"district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the

district court has dismissed all claims over which it has original jurisdiction."  The factors

relevant to this discretionary determination overwhelmingly favor not exercising supplemental

jurisdiction.  The case has not proceeded to discovery.  The Court has no familiarity with the

copyright laws of the 11 foreign nations implicated by Wallert's claims, and limited familiarity

with the case—solely the knowledge gained a result of resolving the instant motion to dismiss.

---

[12] The Court accordingly has no occasion to reach the Universal defendants' alternative
challenges to Wallert's federal copyright infringement claims.  *See* Universal Br. 8–18.

*See, e.g., Torah Soft Ltd. v. Drosnin*, 136 F. Supp. 2d 276, 292 (S.D.N.Y. 2001) (declining to exercise supplemental jurisdiction over foreign law-based copyright infringement claims after dismissing sole federal claim); *Baig v. Coca-Cola Co.*, 69 F. Supp. 3d 766, 781 (N.D. Ill. 2014) (same); *cf. Shaw v. Rizzoli Int'l Pubs., Inc.*, No. 96 Civ. 4259 (JGK), 1999 WL 160084, at *10 (S.D.N.Y. March 23, 1999) (denying motion to dismiss for lack of supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c) where "some federal law claims remain").[13]

Moreover, as follows below, the Court is also separately dismissing, under Rule 12(b)(6), Wallert's state-law claims. This would leave the copyright-infringement claims based on foreign law as the *only* remaining claims in the case. And in any event, Wallert's state-law claims have little, if any, overlap with his foreign-law copyright infringement claims. The state-law claims do not sound in copyright but in doctrines of contract law, and are based on factually separate claims relating to the Rock Recording's licensing. And only one defendant (UMG) is common to the foreign-copyright and state-law contract claims. Therefore, analyzing the issue as a matter of supplemental jurisdiction, with the copyright claims based on United States law having been dismissed, the Court would undoubtedly decline to exercise jurisdiction over Wallert's foreign-law copyright claims.

The inquiry is, however, complicated by the fact that there is clear diversity of citizenship as between, on the one hand, Wallert, and on the other hand, the Universal publishing

---

[13] *Rundquist v. Vapiano SE*, 798 F. Supp. 2d 102 (D.D.C. 2011), on which Wallert relies in urging the exercise of supplemental jurisdiction, is inapposite. The court there had *not* dismissed all claims over which it had original jurisdiction. The defendant in *Rundquist* made a different argument: that the foreign-law infringement claims "substantially predominated" over those as to which the Court has original jurisdiction, so as to counsel against exercising supplemental jurisdiction. *Id.* at 131 (citing 28 U.S.C. § 1367(c)(2)). The court rejected that argument, finding that it was not clear that the foreign-law claims so predominated. *Id.* at 132.

defendants, UMG, and the Starlight defendants.  (Wallert recites diversity as a jurisdictional basis for his state-law claims.)[14]  Therefore, although Wallert oddly does not invoke diversity jurisdiction in his brief opposing the motion to dismiss as a basis to salvage his foreign-law claims of copyright infringement, the Court treats those claims as properly before it on that jurisdictional basis.

Wallert's copyright-infringement claims based on the laws of foreign countries—some 11 countries in total, based on the FAC—are, however, rightly dismissed for a different reason: based on the doctrine of *forum non conveniens*.

"The doctrine of *forum non conveniens* permits a court to 'resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute,' *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947), if dismissal would 'best serve the convenience of the parties and the ends of justice.'  *Koster v. (Am.) Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 527 (1947)."  *Murray v. British Broad. Corp.*, 81 F.3d 287, 290 (2d Cir. 1996); *see also Gross v. British Broad. Corp.*, 386 F.3d 224, 229 (2d Cir. 2004) (confiding decision to dismiss for *forum non conveniens* to "sound discretion of the district court").

The Second Circuit "has set forth a three-step inquiry for *forum non conveniens* challenges. . . .  First, the court determines the degree of deference properly accorded to the

---

[14] The requirements of diversity jurisdiction—complete diversity and an amount in controversy exceeding $75,000—are undisputedly met here.  *See Intelligen Power Sys., LLC v. dVentus Techs. LLC*, 73 F. Supp. 3d 378, 380 (S.D.N.Y. 2015) (citing *Strawbridge v. Curtiss*, 7 U.S. 267, 267 (1806); 28 U.S.C. § 1332).  Wallert is a resident of New York.  FAC ¶ 2.  Of the Universal publishing defendants, UMP France and UMPGB France are French corporations; UMP US is a Delaware corporation with a principal place of business in California; MGB Songs is unincorporated, and has a principal place of business in California.  *Id.* ¶ 3.  UMG is a Delaware corporation with a California principal place of business.  *Id.*  Of the Starlight defendants, Atlan is a resident of France, Hoffman is a resident of Florida, and Lafesse is a French entity.  *Id.*

plaintiff's choice of forum. . . .    Secondly, it considers whether an alternative forum exists. . . .

Finally, it balances the public and private interest implicated in the choice of forum." *Rentokil-*

*Initial Pension Scheme v. Citigroup Inc.*, 614 F. App'x 27, 28 (2d Cir. 2015) (summary order)

(citing *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 65, 70–74 (2d Cir. 2001)).

First, as to the level of deference owed to the choice of forum, "[a] domestic petitioner's

choice of its home forum receives great deference." *In re Arbitration between Monegasque De*

*Reassurances S.A.M. v. Nak Naftogaz of Ukr.*, 311 F.3d 488, 498 (2d Cir. 2002).  This Circuit

has stated that:

> The more it appears that a domestic or foreign plaintiff's choice of forum has been
> dictated by reasons that the law recognizes as valid, the greater the deference that
> will be given to the plaintiff's forum choice.  Stated differently, the greater the
> plaintiff's or the lawsuit's bona fide connection to the United States and to the
> forum of choice and the more it appears that considerations of convenience favor
> the conduct of the lawsuit in the United States, the more difficult it will be for the
> defendant to gain dismissal for *forum non conveniens*. . . .  On the other hand, the
> more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-
> shopping reasons . . . the less deference the plaintiff's choice commands and,
> consequently, the easier it becomes for the defendant to succeed on a *forum non*
> *conveniens* motion by showing that convenience would be better served by
> litigating in another country's courts.

*Iragorri*, 274 F.3d at 71–72.  Here, Wallert, a U.S. citizen, is suing in his home forum, and that

decision merits deference.  But not decisive deference:  "A court considering a motion for

dismissal on the ground of *forum non conveniens* does not assign talismanic significance to the

citizenship or residence of the parties, and there is no inflexible rule that protects U.S. citizen or

resident plaintiffs from having their causes dismissed for *forum non conveniens*." *Pollux*

*Holding Ltd. v. The Chase Manhattan Bank*, 329 F.3d 64, 73 (2d Cir. 2003) (internal quotation

marks and citations omitted); *see also Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 102 (2d

Cir. 2000) (no "rigid rule of decision protecting U.S. citizen or resident plaintiffs from dismissal

for *forum non conveniens*.").  Wallert argues that this case should remain here because "U.S. law

protects U.S. copyright holders . . . through the right to statutory damages." Wallert U Br. 20.

But Wallert lacks standing to bring claims under U.S. copyright law—what is at issue are solely

his claims under foreign law.  And the assembled record does not leave the Court with

confidence that Wallert's choice of forum was animated by convenience.  He has, tellingly,

failed to perfect jurisdiction over a central defendant, Hoffman, a French citizen and Florida

resident; and were the case to remain in New York, it appears that Wallert would face similar,

possibly prohibitive, jurisdictional challenges as to his claims against UMP France, Lafesse, and

Atlan.  Wallert's claim of convenience thus is solipsistic:  His chosen forum appears not only

inconvenient, but unavailable based on lacking personal jurisdiction as to numerous defendants.

Moreover, the foreign copyright infringement claims could, it appears, commonly be litigated in

a French forum—the alternative to proceeding in New York would not be lawsuits in 11

different foreign countries.  *Cf. Levitin v. Sony Music Entm't*, No. 14 Civ. 4461 (PAC), 2015 WL

1849900, at *10 (S.D.N.Y. Apr. 22, 2015) (finding that New York was an "obviously more

convenient [forum] for [plaintiffs] than the nine separate countries of the [defendants]").

Second, a party seeking dismissal for *forum non conveniens* must show that there is an

adequate alternative forum.  *See Wiwa*, 226 F.3d at 100.  An alternative forum is adequate if it

"permits litigation on the subject matter in dispute and in which defendants are amenable to

service of process."  *Rentokil-Initial Pension Scheme*, 614 F. App'x at 29; *see also Capital*

*Currency Exchange N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 609 (2d Cir. 1998) ("An

alternative forum is adequate if: (1) the defendants are subject to service of process there; and (2)

the forum permits litigation of the subject matter of the dispute.").  The Universal defendants

argue that France is an adequate alternative forum because "courts in France permit litigation as

to infringement of copyright and commercial disputes," and UMP France is a French

corporation.  Universal Br. 21 (citing French Intellectual Property Code, Art. L331-1).  Further, Wallert does not dispute that France is an adequate alternative forum.  Wallert U Br. 19.  The Court therefore finds as such.

Finally, the Court considers the private and public interest factors set forth by the Supreme Court in *Gilbert*.

Relevant private interests include "(1) the relative ease of access to sources of proof, (2) the availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses, (3) any possibility of view of premises, if relevant, and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive."  *In re Citigroup Inc. Secs. Lit.*, No. 12 Civ. 6653 (SHS), 2014 WL 470894, at *4 (internal quotation marks and citation omitted).  Here, the private factors strongly favor France, because resolving Wallert's foreign law claims will require testimony from French witnesses, analysis of French (and other EU) law, and evidence that will overwhelmingly be found in France.  *See* Universal Br. 21–22 (foreign copyright infringement claims "involve the exploitation of a composition written by French artists pursuant to licenses negotiated between a French publisher and other foreign entities, consummated in France, and governed by French law addressing uses that occurred mostly in Europe," meaning that the "vast majority of documentary proof and witnesses will be in France, with the remainder of the evidence and witnesses being mostly in European countries.").  And because most witnesses will undisputedly be based in Europe, securing these witnesses for trial will be far less expensive in France than in New York.  *Id.* at 22.

Wallert counters that because the Universal defendants are "sophisticated corporate entities," "slight challenges to discovery do not weigh in favor of dismissal."  Wallert U 20–21. He proposes that, to economize, trial proceed by means of videotaped testimony.  *Id.* (citing

*Deston Songs LLC v. Wingspan Records*, No. 00 Civ. 8854 (NRB), 2001 WL 799811, at *6

(S.D.N.Y. July 16, 2001)). But there are other defendants as to the foreign law claim: Atlan,

Hoffman, and Lafesse (the Starlight defendants), none of whom is clearly a "sophisticated

corporate entit[y]" (and Atlan and Hoffman are individuals). And while videotaped testimony is

usable in court when necessary (*e.g.*, witness unavailability), live testimony is preferable. And,

as the Universal defendants points out, trial here of the foreign-law claims arising from conduct

abroad would generate a host of other costs and inefficiencies.

The relevant public interests are "(1) the administrative difficulties associated with court

congestion; (2) the unfairness of imposing jury duty on a community with no relation to the

litigation; (3) the interest in having localized controversies decided at home; and (4) avoiding

difficult problems in conflict of laws and the application of foreign law." *Levitin*, 2015 WL

1849900, at *11 (quoting *Rio Tinto PLC v. Vale S.A.*, No. 14 Civ. 3042 (RMB) (AJP), 2014 WL

7191250, at *15 (S.D.N.Y. Dec. 17, 2014)). As noted, Wallert's foreign law claims of

copyright-infringement arise out of activities by French parties in France, and the resulting sales

and licensing of Starlight in France and other countries, chiefly in Europe. *See* Universal Br. 22.

Thus, a trial here would require this Court, and a New York jury, to apply the laws of France and

10 other countries, *i.e.*, to resolve a distinctly *non*-localized controversy.

In *Stewart v. Adidas A.G.*, Judge Cote was faced with a similar issue, involving claims

under German and potentially other foreign countries' copyright laws. No. 96 Civ. 6670 (DLC),

1997 WL 218431, at *7 (S.D.N.Y. Apr. 30, 1997). She noted that "difficult conflict of laws

issues [would] arise in this case regarding the application of German law to alleged

infringements in foreign countries other than the United States and Germany." *Id.* She

concluded that a "German court would be much more able to ascertain whether German or other

law would apply to [plaintiff's] claims against [defendant] for sales in third countries." *Id.*  She further observed, perceptively, that "it is not clear that German courts would even recognize an American judgment based on German copyright law." *Id.*  Wallert, notably, has not provided the Court with any basis to conclude that a judgment here based on the laws of the 11 countries at issue would be recognized in those lands.   Like Judge Cote, the Court finds that the "difficulty of applying [foreign law] . . . is a significant factor in the balance of convenience factors." *Id.* Wallert counters, lamely, that because he is a New York resident, there is "local interest in the controversy." Wallert U Br. 20.  That is scarcely so.  Wallert's allegations arise out of activity an ocean away.  It is conjectural at best that any New Yorker other than Wallert himself would have an interest in the resolution of those foreign claims.  "It would be simply unfair to impose the burden of service on a New York jury because of the attenuated contact of New York to the controversy." *Stewart*, 1997 WL 218431, at *7.

Given the foregoing analysis, the balance of interests compellingly favors dismissal of the foreign-law copyright infringement claims, based on the doctrine of *forum non conveniens*. The Court accordingly dismisses those claims.  In so doing, of course, the Court does not express any view as to merits of those claims.

### C.    State Law Claims Related to The Rock Recording's Licensing

Wallert's state-law claims include: (1) breach of contract under California law against UIM BV, (2) tortious breach of the covenant of good faith and fair dealing under California law against UIM BV, (3) wrongful interference with prospective contractual claims against UIM

BV,[15] and (4) breach of contract under New York law against UMG. The Universal defendants move to dismiss these claims for failure to state a claim. The Court addresses the claims in turn.

### 1.    Breach of contract under California law against UIM BV

Wallert claims that under the RSO agreement, UIM BV is required to pay royalties to Wallert, but has not done so. FAC ¶¶ 89–90. Specifically, Wallert alleges that Sony BMG sampled The Rock recording on at least three occasions—the Starlight recording, the Mango recording, and the Mango karaoke recording, and that under the terms of the UMG-Sony BMG agreement or another similar agreement, "UIM BV was and is obligated to collect royalties for any and all sample licensing of The Rock Record by Sony BMG." *Id.* ¶ 96.

Under California law, to claim a breach of contract, a plaintiff must plead the following elements: (1) the existence of a contract, (2) the plaintiff's performance or valid excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damages to plaintiff. *Careau & Co. v. Security Pacific Business Credit, Inc.*, 222 Cal. App. 3d 1371, 1388 (1990). The Universal defendants argue that Wallert's breach of contract claim based on the UMG-Sony BMG agreement fails because the FAC lacks any allegation that Sony BMG ever "executed a Short Form License for the use of the Rock Recording in these recordings," as required under that agreement. Universal Br. 24.

The Court agrees. The UMG-Sony BMG agreement is a global agreement. It puts in place a framework to apply to subsequent agreements as to specific recordings—that is, it sets out the procedures that recording artists from both UMG and Sony BMG are to use to execute a short form license governing the sampling of specific recordings. And the agreement sets out the

---

[15] These claims are also brought against the three Starlight defendants. Of the three, however, the Court has held that there is no personal jurisdiction over Hoffman, and the other two have not appeared.

general terms and obligations that would govern such licenses.[16]  However, the UMG-Sony

BMG agreement, being an overarching template, does not set out any of the specific terms (*e.g.*,

royalty rate, sampling artist, sampling record, etc.) that would be necessary for, and contained in,

a short-form license governing a specific recording. *See* Tr. 16–17.

To assert a cognizable breach of contract claim under California law based on the failure

to pay royalties relating to The Rock recording, the FAC would thus need to plead that (1) Sony

BMG and UMG executed a short form license pursuant to the Sony BMG-UMG agreement,

setting out terms governing the sampling of The Rock recording; (2) Sony Music paid UMG; (3)

UMG thereafter paid UIM BV; and (4) UIM BV failed to pay Wallert, pursuant to the RSO

agreement.  The FAC, however, lacks any allegation that any such short-form agreement as to

The Rock recording was ever entered into.  The FAC instead merely alleges conclusorily that

"[p]ursuant to the express terms of the [UMG-Sony BMG agreement] . . . UIM BV was and is

obligated to collect royalties for any and all sample licensing of The Rock Record by Sony

BMG."  FAC ¶ 96.  This pleading is inadequate, because the UMG-Sony BMG agreement lacks

the essential terms to create a definite and enforceable agreement as to The Rock recording,

which, notably, is unmentioned in the overarching Sony BMG-UMG agreement.  The Court

therefore dismisses the breach of contract claim against UIM BV.

### 2.      Tortious breach of the covenant of good faith and fair dealing under California law against UIM BV

The Universal defendants also move to dismiss Wallert's claims for breach of the implied

covenant of good faith and fair dealing.  "The covenant of good faith and fair dealing, implied by

---

[16] For example, the UMG-Sony BMG agreement states that the "Licensee will pay Licensor a royalty on all sales and commercial exploitations of the New Recording as set forth in [the UMG-Sony BMG agreement] and the Short Form License concerned."  UMG-Sony BMG agreement ¶ 4(a)(1).

California law in every contract, exists to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement." *Davis v. Capitol Records, LLC*, No. 12 Civ. 1602 (YGR), 2013 WL 1701746, at *4 (N.D. Cal. Apr. 18, 2013) (citing *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 349 (2000)). However, "California courts have severely restricted the circumstances under which plaintiffs may maintain a claim for breach of the implied covenant of good faith and fair dealing." *Pamlioff v. Giant Records, Inc.*, No. 91 Civ. 1708 (RFP) (ENE), 1991 WL 334916, at *7 (N.D. Cal. Oct. 28, 1991). "[T]he implied covenant protects only the parties' right to receive the benefit of their agreement." *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 698 n.39 (1988). It does not "protect some general public policy interest not directly tied to the contract's purposes." *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 155 F. Supp. 2d 1, 16 (S.D.N.Y. 2001) (quoting *Foley*, 47 Cal.3d at 690)).

Specifically, under California law:

> There are five elements to a breach of the implied covenant of good faith and fair dealing: (1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct.

*Tervon, LLC v. Jani-King of Cal., Inc.*, No. 14 Civ. 2548 (BAS) (JMA), 2015 WL 4135162, at *4 (S.D. Cal. July 8, 2015) (citing *Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010)).

The FAC brings two claims of a breach of the covenant of good faith and fair dealing. First, it alleges that UIM BV failed to inform Wallert of his rights, under the UMG-Sony BMG agreement, with respect to the sampling of the Rock recording. This, the FAC claims, served to deprive Wallert of money due him under the RSO agreement. FAC ¶¶ 101–06. But this claim fails for the same reason as its breach of contract claim. The FAC does not allege that there was

ever a short-form license relating to the Rock recording.  Absent such a license, Wallert did not

have any contractual right to royalties traceable to the UMG-Sony BMG Agreement.

Second, the FAC broadly alleges that, under the RSO agreement, Wallert was entitled to

notice from UIM BV any time the Rock recording was utilized on any audio-visual device.  As

to the source of that alleged duty,  the FAC cites a provision in the RSO agreement, which states

that "[UIM BV] shall not utilize or authorize others to utilize the Masters [recordings] . . . on any

so-called 'audio-visual devices' or 'sight and sound devises' . . . other than for promotional

purposes without [Wallert's/Family Records'] prior consent."  RSO Agreement ¶ 3 (cited at FAC

¶ 108).  And, it notes, "[a]udio-visual devices" and "sight and sound devices" are defined as "any

record embodying the spelling [sic] audio performances synchronized with or accompanied by

visual images of the Artist."  RSO agreement ¶ 23 (cited at FAC ¶ 108).  Together, the FAC

claims, these terms obliged UIM BV to seek Wallert's written consent "before either approving

or acquiescing in use of The Rock Record in videos of the [Starlight recording]," and that UIM

BV failed to license The Rock recording because it "had no intention of complying with the RSO

Agreement" and "deprive[d] [Wallert] of monies due [to Wallert] under the RSO Agreement."

FAC ¶¶ 110–12.

The RSO agreement, however, defines the term "Artist" more narrowly than Wallert

imagines.  It defines that term as the "group of musicians, singers and other artists performing

under the name 'EAST COAST.'"  RSO agreement ¶ 1.  Therefore, under the RSO agreement,

UIM BV's notification obligation to Wallert applied only where the audio performance at issue

included images of East Coast.  There is no allegation in the FAC as to any such breach of that

term.

36

The Court therefore dismisses the FAC's two counts of breach of the covenant of good faith and fair dealing against UIM BV.

### 3.   Wrongful interference with prospective contractual relations against UIM BV

The FAC next alleges that UIM BV wrongfully interfered with Wallert's prospective contractual relations.  Under California law:

> The elements for a cause of action for intentional interference with contractual relations and for intentional interference with prospective economic advantage essentially are: (1) a contract or other economic relationship between plaintiff and a third party; (2) the defendant's knowledge of the contract or relationship; (3) defendant's intentional acts designed to induce a breach or disrupt the contract or relationship; (4) actual breach or disruption; and (5) damage.

*PNY Technologies, Inc. v. SanDisk Corp.*, No. 11 Civ. 4689 (YGR), 2012 WL 1380271, at *14 (N.D. Cal. Apr. 20, 2012) (citing *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003); *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55 (1998)).

Here, the FAC alleges that (1) Wallert "has long enjoyed advantageous business relationships and contractual rights with various successful artists, songwriters and record companies and the opportunities for establishing further such relationships," FAC ¶ 117, (2) UIM BV and the Starlight defendants "were aware of or should have known of those advantageous business relationships, contractual rights and opportunities," *id.* ¶ 118, and (3) UIM BV and the Starlight defendants "have been guilty of gross, wanton and willful conduct," *id.* ¶ 123.

These allegations, under California law, are inadequate to state a claim, as the decision in *PNY Technologies* helpfully illustrates.  There, the plaintiff similarly alleged that "'[plaintiff] has existing and valuable business relationships, as well as reasonable expectations of further and future relationships, with manufacturers, retailers, and purchasers relating to flash memory technology,' that '[defendant] was aware of these prospective business and actual contractual

relationships and engaged in intentional and wrongful conduct designed or calculated to disrupt and interfere with those relationships,' and that '[defendant's] conduct in interfering with such prospective business and actual contractual relations is intentional, malicious, and without justification." 2012 WL 1380271, at *14 (citing the complaint in *PNY Technologies*).

The court held that those allegations were "not 'facts.'  They [were] legal conclusions." *Id.*  It held that a plaintiff who alleges wrongful interference with contractual relationships must identify the contractual third-party "in some manner," whereas the plaintiff there "provid[ed] no facts from [which] one can discern the relationships with which [the defendant] ha[d] interfered (or at least more specific than every contractual relationship [the plaintiff] has ever or will ever enter into)." *Id.* (citing *Ramona Manor Convalescent Hosp. v. Care Enters.*, 117 Ca. App. 3d 1120, 1133 (1986).  These deficiencies, the *PNY Technologies* court held, required dismissal of the claims for wrongful interference with contractual relationships.  *Id.*

Wallert seeks to distinguish *PNY Technologies* because that case involved "antitrust issues."  Wallert U Br. 22 n.14.  That distinction is weak.  Although *PNY Technologies* also included antitrust claims, the complaint also alleged wrongful interference with business relationships.  2012 WL 1380271, at *14.  The Court therefore dismisses the FAC's wrongful interference with contractual relationships claim against UIM BV.

### 4.       Breach of contract under New York law against UMG

The FAC next alleges that UMG breached the UMG-Sony Agreement by "failing to properly license and/or collect royalties therefor with respect to the Infringing [Starlight] Record and/or to account to UIM BV therefor."  FAC ¶ 125.

Under New York law, "to state a claim of breach of contract, the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure

of defendant to perform; and (iv) damages." *PNC Bank, Nat'l Ass'n v. Wolters Kluwer Fin. Servs., Inc.*, 73 F. Supp. 3d 358, 367 (S.D.N.Y. 2014) (citing *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)). A court "cannot 'supply a specific obligation the parties themselves did not spell out.'" *Spinelli v. Nat'l Football League*, No. 13 Civ. 7398 (RWS), 2015 WL 1433370, at *38 (S.D.N.Y. March 27, 2015) (quoting *Tonking v. Port Auth. of N.Y. and N.J.*, 3 N.Y.3d 486, 490 (2004)). Further, "New York law and the *Twombly-Iqbal* standard of federal pleading require a complaint to identify, in non-conclusory fashion, the specific terms of the contract that a defendant has breached. Otherwise, the complaint must be dismissed." *Id.* (citing *Swan Media Grp., Inc. v. Staub*, 841 F. Supp. 2d 804, 807–08 (S.D.N.Y. 2012); *Orange Cty. Choppers, Inc. v. Olaes Enter., Inc.*, 497 F. Supp. 2d 541, 554 (S.D.N.Y. 2007); *Highlands Ins. Co. v. PRG Brokerage, Inc.*, No. 01 Civ. 2272 (GBD), 2004 WL 35439, at *8 (S.D.N.Y. Jan. 6, 2004)).

The Universal defendants first argue that this contract breach claim is deficient because the FAC "does not plead what provision of the agreement UMG [Recordings] purportedly breached, any factual allegations as to what specific actions constituted the breach, and to whom that contractual obligation was owed," and thus does not meet the pleading requirements of *Twombly* and *Iqbal*. Universal Br. 23 n.16. Wallert responds that, by attaching the UMG-Sony BMG agreement, the FAC adequately pled a breach of contract. Wallert U Br. 21–22 n.13. That is wrong. Merely attaching a contract does not allege a breach of its terms—the complaint must identify the contractual obligation that was breached and allege how. *Spinelli*, 2015 WL 1433370, at *39. The FAC does not do so here.[17]

---

[17] Separately, Wallert argues that *Iqbal* and *Twombly* do not govern his pleadings, because *Iqbal* "involved unconstitutional actions by government officials" and *Twombly* "was an antitrust case which requires greater pleading specificity." Wallert U. Br. 22 n.13. But the pleading standards

In a variant of their observation that no short-form license agreement was ever entered into based on the UMG-Sony BMG agreement, the Universal defendants next argue that because Wallert is not a party to the UMG-Sony BMG agreement, he has no standing to bring a claim for its breach. Universal Br. 23, n.16. Wallert responds that he does not need to "be a party to the agreement in order to claim rights under it as a third-party beneficiary." Wallert U Br. 22 n.13. But the FAC does not allege that Wallert was a third-party beneficiary of that agreement, or, as discussed, that he was party to a short-form license created pursuant to the template envisioned by the agreement. The Court therefore dismisses this claim for failure to state a claim.

### D.     Wallert's Motion for Leave to Take Jurisdictional Discovery

Finally, Wallert moves for leave to take discovery into issues of personal jurisdiction, in support of his claims against Hoffman and one Universal defendant (UMP France). Wallert U Br. 24–25; Wallert H Br. 11–12. That motion is denied.

As to Hoffman, Wallert has not made out a *prima facie* case of personal jurisdiction. To be sure, the failure to make such a showing does not categorically preclude jurisdictional discovery. *See Ehrenfeld v. Mahfouz*, 489 F.3d 542, 550 n.6 (2d Cir. 2007). But, "where the plaintiff has failed to make out a *prima facie* case, courts have displayed an unwillingness to grant additional discovery on jurisdictional issues." *Langenberg*, 2006 WL 2628348, at *5. "A district court has wide latitude to determine the scope of discovery, and is typically within its discretion to deny jurisdictional discovery when the plaintiff has not made out a *prima facie* case for jurisdiction." *Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Republic*, 582 F.3d 393, 401

---

articulated in those cases have widely been understood to apply outside those specific contexts, including in many breach of contract cases in this Circuit. *See, e.g., Landmark Ventures, Inc. v. Wave Sys. Corp.*, 513 F. App'x 109 (2d Cir. 2013) (summary order); *Moreno-Godoy v. Gallet Dreyer & Berkey, LLP*, No. 14 Civ. 7082 (PAE), 2015 WL 5737565, at *11–12 (S.D.N.Y. Sept. 30, 2015); *Liddle & Robinson, LLP v. Garrett*, 720 F. Supp. 2d 417, 423–24 (S.D.N.Y. 2010).

(2d Cir. 2009). As to Hoffman, Wallert has not come close to making "an arguable showing of jurisdiction or identified a genuine issue of jurisdictional facts to warrant jurisdictional discovery." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 611 (S.D.N.Y. 2012); *see also A.W.L.I. Grp., Inc.*, 828 F. Supp. 2d at 575. The Court declines to "allow plaintiff to engage in an unfounded fishing expedition for jurisdictional facts." *Langenberg*, 2006 WL 2628348, at *5.

As to UMP France, jurisdictional discovery would not serve a productive purpose. Although UMP France indeed disputes personal jurisdiction, the Court has had no occasion to reach that issue, having dismissed, under Rule 12(b)(6), the claims brought against it and its fellow Universal defendants. Even were Wallert to fortify his claim of personal jurisdiction against UMP France, those substantive defects in his claims would remain.

The Court therefore denies Wallert's request to take jurisdictional discovery.

## CONCLUSION

For the foregoing reasons, the Court grants the Universal defendants' and Hoffman's motions to dismiss and denies Wallert's motion for leave to take jurisdictional discovery.

As to Wallert's copyright claims brought under United States law, the dismissal is without prejudice to bring a future lawsuit, insofar as it is conceivable that Wallert may one day acquire standing to bring such claims (*e.g.*, upon the dissolution of Moonstruck). As to Wallert's copyright claims brought under foreign law, the dismissal is without prejudice to Wallert's right to bring such claims in a foreign forum. As to Wallert's state-law claims, the dismissal is with prejudice.

The Clerk of Court is directed to terminate the motions pending at docket numbers 99,

124 , and 143, and to dismiss the Universal defendants and Hoffman from this case.[18]


SO ORDERED.


*Paul A. Engelmayer*
_____
Paul A. Engelmayer
United States District Judge

Dated: October 26, 2015
       New York, New York

---

[18] The Court notes that, as to the other defendants in this case, they have yet to either (1) appear in this case (*i.e.*, Atlan and Lafesse), or (2) be served with the FAC (*i.e.*, Cyclo Records, Cyclo Music, the Hot Bitch defendants, Does 1–50, and XYZ Corporations 1–50). The Court therefore will issue a separate order as to these defendants.